958 A.2d 385

James **RHEE**, et al.

v.

**HIGHLAND DEVELOPMENT CORPORATION, et al.**

**No. 1765, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

Oct. 7, 2008.

518

Michael P. Coyle, Columbia, for Appellant.

Angus R. Everton (Alan M. Carlo, Morgan, Carlo, Downs & Everton, PA, on brief), Hunt Valley, (Jonathan A. Azrael, Azrael, Gann & Franz, LLP, on brief), Baltimore, (James R. Chason, Chason, Rosner, Leary & Marshall, LLC, on brief), Towson, for Appellee.

Panel: EYLER, DEBORAH S.,* ADKINS, SALLY D., J. FREDERICK SHARER (Ret'd, Specially Assigned), JJ.

---

* Sally D. Adkins, Associate Judge of the Court of Appeals, participated in the hearing and conference of this case while an active member of this

EYLER, DEBORAH S., J.

In the Circuit Court for Howard County, James and Linda Rhee, the appellants, sued Highland Development Corporation, Richard Demmitt, Fisher Collins & Carter, Inc., and Ronald Carter, the appellees, for fraud. The Rhees are subsequent purchasers of a house the appellees built and sold to initial purchasers. The Rhees alleged that, when the appellees originally built and sold the house, they fraudulently concealed, by desecration and other acts of misconduct, the presence of an abandoned cemetery on the property. The appellees filed a motion to dismiss, which the circuit court granted, with prejudice, on the ground that the appellees did not owe the Rhees a legal duty.[1]

On appeal, the Rhees challenge the court's decision to dismiss the fraud claim, posing two questions for review, which we have consolidated and rephrased:[2]

Did the circuit court err in granting the appellees' motion to dismiss the appellants' claim for fraudulent concealment?

For the following reasons, we shall reverse the judgment of the circuit court and remand the case to that court for further proceedings not inconsistent with this opinion.

## FACTS AND PROCEEDINGS

The first amended complaint is the operative pleading for our purposes. It contains the following allegations of fact.

---

Court; she participated in the adoption of this opinion as a specially assigned member of this Court.

1. The Rhees also sued for civil conspiracy. The court dismissed that count as well. The Rhees have not challenged that decision in this appeal.

2. The questions as phrased by the appellants are as follows:
 "1. Did the circuit court err in granting Appellees' motions to dismiss Appellants' fraud claims based on its determination that Appellees did not make any misrepresentations directly to Appellants, as subsequent purchasers?
 "2. Can a fraudulent concealment claim be sustained, regardless of whether the parties have a confidential or fiduciary relationship, if the defendant remains silent regarding a fact that it has taken some affirmative act to suppress or conceal?"

The Rhees own and live in a single-family house at 13809 Lakeside Drive, in Clarksville ("the Property"). The Property is part of Brighton Pines, a residential housing development. It is identified as "Lot 20" in the subdivision plan for Brighton Pines filed in the Howard County Land Records.

"In the 1980's," Highland Development Corporation ("Highland") and Fisher, Carter & Collins ("FCC") oversaw construction of the Brighton Pines Development.[3] At all relevant times, Richard Demmitt was president of Highland and Ronald Carter was a principal in FCC.

When the appellees were in the process of developing Brighton Pines, they discovered on the land comprising Lot 20 a small cemetery consisting of more than twenty headstones, many dating to the 1700's. The cemetery, which appeared to have been abandoned, is not depicted in the Howard County Land Records.

Demmitt and others acting at his direction removed the headstones so the area no longer was identifiable to the naked eye as a cemetery. Carter then moved the "building restriction lot lines for Lot 20 so that the [now desecrated and not visible] cemetery was included in an area where no construction was allowed." Finally, "[i]n order to fraudulently conceal that there was a cemetery" on Lot 20, Carter "removed any references to the cemetery before the worksheets [necessary for the subdivision approval] were submitted to any State or County agencies. As such, nothing in connection with the subdivision is recorded with any ... agency reflecting the presence of the cemetery" on Lot 20.

Lot 20 was sold to the initial purchasers as the Property.[4] The initial purchasers never knew that there was a desecrated cemetery on the Property. On March 14, 1991, the initial purchasers sold the Property to the Rhees. When the Rhees

---

3. A more specific date is not alleged.

4. The complaint does not identify the "initial purchasers" or disclose when they purchased the Property.

purchased the Property, they knew nothing about the desecrated cemetery.

Thirteen years later, on May 24, 2004, the Rhees learned there was a desecrated cemetery on the Property from a person who had been involved in developing Brighton Pines.[5] According to the Rhees, the appellees' fraudulent concealment of the desecrated cemetery induced the Rhees to purchase the Property; and the value of the Property with the desecrated cemetery is "significantly less than it otherwise would be absent the cemetery being located thereon."

In dismissing the Rhees' fraud claim, the court reasoned:

It is clear that with a fraud, whether it be misrepresentation or a concealment claim, there has to be a duty to the particular plaintiff. There needs to be, certainly, statements made to a particular plaintiff and I think that to extend that beyond to a class of plaintiffs is certainly not appropriate in this case.

The Rhees noted a timely appeal.

## DISCUSSION

### Contentions

The Rhees contend the appellees' duty, as developer/sellers of the Property, not to fraudulently conceal the presence of the cemetery on the Property extended to them, as subsequent purchasers. They argue that, just as the Court of Appeals held in *Diamond Point Plaza Ltd. Partnership v. Wells Fargo Bank, N.A.*, 400 Md. 718, 929 A.2d 932 (2007), that a defendant's duty to refrain from fraudulently misrepresenting a material fact extends not only to the other party to the pertinent transaction but also to the people or "class of people" the defendant has "reason to expect" will rely upon the misrepresentation, a defendant developer/seller's duty to refrain from fraudulently concealing a materially adverse condition of real property also extends beyond the initial purchas-

---

5. The first amended complaint does not identify that person by name.

er of the property to the people or "class of people" the defendant has "reason to expect" will rely upon the concealment.

The appellees respond first that, in Maryland, an essential element of a cause of action sounding in fraud is the communication, verbal or non-verbal, of a misrepresentation by the defendant to the plaintiff. Here, there was no such communication, and so the fraud claim must fail. They further argue that, if it were otherwise, a developer/seller's liability in fraud would extend to any number of subsequent purchasers of real property with whom the developer/seller had no contact and who did not have an ownership or possessory interest in the property when the acts of fraudulent concealment took place. The appellees further maintain that the presence of the cemetery on the Property was not a material defect affecting valuation, and for that reason they did not owe any duty to disclose it, either to the initial purchasers or to any subsequent purchasers. Finally, the appellees argue that in any event the Rhees did not sufficiently plead damages so as to state a claim for fraudulent concealment.

### *Standard of Review*

On appeal from a decision to grant a motion to dismiss for failure to state a claim upon which relief can be granted, " 'we must determine whether the [operative] complaint, on its face, discloses a legally sufficient cause of action.' " *Schisler v. State*, 177 Md.App. 731, 742–43, 938 A.2d 57 (2007) (quoting Md. Rule 2–322(b)(2); *Fioretti v. Md. State Bd. of Dental Exam'rs*, 351 Md. 66, 72, 716 A.2d 258 (1998)). We " 'determine whether the trial court was legally correct, examining solely the sufficiency of the pleading.' " *Pendleton v. State*, 398 Md. 447, 459, 921 A.2d 196 (2007) (quoting *Ricketts v. Ricketts*, 393 Md. 479, 492, 903 A.2d 857 (2006)). In doing so, "we accept all well-pled facts in the complaint, and reasonable inferences drawn from them, in a light most favorable to the non-moving party." *Sprenger v. Pub. Serv. Comm'n of Md.*, 400 Md. 1, 21, 926 A.2d 238 (2007) (quoting *Converge Servs. Group v. Curran*, 383 Md. 462, 475, 860 A.2d 871 (2004)). "We

will only find that dismissal was proper ' "if the alleged facts and permissible inferences, so viewed, would, if proven, nonetheless fail to afford relief to the plaintiff." ' " *Id.* (quoting *Pendleton, supra,* 398 Md. at 459, 921 A.2d 196).[6]

## Analysis

▇▇▇ In Maryland, the essential elements of a cause of action for fraudulent concealment are:

"(1) the defendant owed a duty to the plaintiff to disclose a material fact; (2) the defendant failed to disclose that fact; (3) the defendant intended to defraud or deceive the plaintiff; (4) the plaintiff took action in justifiable reliance on the concealment; and (5) the plaintiff suffered damages as a result of the defendant's concealment."

*Lloyd v. Gen. Motors Corp.,* 397 Md. 108, 138, 916 A.2d 257 (2007) (quoting *Green v. H & R Block,* 355 Md. 488, 525, 735 A.2d 1039 (1999)). Each element must be proven by clear and convincing evidence. *Md. Envtl. Trust v. Gaynor,* 370 Md. 89, 97, 803 A.2d 512 (2002).

▇▇▇ In the context of the sale of real property, nondisclosure of a material fact ordinarily is not actionable, but fraudulent concealment of a material fact is:

Non-disclosure is a failure to reveal facts. It may exist where there is neither representation nor concealment. Except in a few special types of transactions, such as insurance contracts and transactions between a fiduciary and his beneficiary, there is no general duty upon a party to a transaction to disclose facts to the other party. *To create a cause of action, concealment must have been intentional and effective—the hiding of a material fact with the attained object of creating or continuing a false impression as to that fact. The affirmative suppression of the truth must have been with intent to deceive.*

---

**6.** The factual allegations made by the Rhees in the first amended complaint are well-pleaded and therefore have been accepted for purposes of appellate review. The appellees emphasize that they vigorously dispute all of the allegations against them.

*Fegeas v. Sherrill,* 218 Md. 472, 476–77, 147 A.2d 223 (1958) (internal citations and quotations omitted) (emphasis added).

In discussing the fraudulent concealment of a cause of action, the Court of Appeals has observed:

> "Absent a fiduciary relationship ... a plaintiff seeking to establish fraudulent concealment must prove that the defendant took affirmative action to conceal the cause of action and that the plaintiff could not have discovered the cause of action despite the exercise of reasonable diligence and that ... *the affirmative act on the part of the defendant must ... be some act intended to exclude suspicion and prevent injury, or there must be a duty on the part of the defendant to disclose such facts, if known.*"

*Id.* (quoting *Frederick Road v. Brown & Sturm,* 360 Md. 76, 100 n. 14, 756 A.2d 963 (2000)) (citations omitted) (emphasis added).

■ In other words, "fraudulent concealment—without any misrepresentation or duty to disclose—can constitute commonlaw fraud.... Although silence as to a material fact (nondisclosure), without an independent disclosure duty, usually does not give rise to an action for fraud, suppression of the truth with the intent to deceive (concealment) does." *United States v. Colton,* 231 F.3d 890, 899 (4th Cir.2000). This is so because, as the Supreme Court has explained, a fraudulent concealment is "equivalent to a false representation." *Stewart v. Wyoming Cattle Ranche Co.,* 128 U.S. 383, 388, 9 S.Ct. 101, 32 L.Ed. 439 (1888).

*See also Hoffman v. Stamper,* 385 Md. 1, 28 n. 12, 867 A.2d 276 (2005) (fraud may consist of suppression of the truth as well the assertion of a falsehood); *Schnader v. Brooks,* 150 Md. 52, 57–58, 132 A. 381 (1926) (concealment may amount to fraud "where it is effected by misleading and deceptive talk, acts, or conduct, or is accompanied by misrepresentations, or where, in addition to a party's silence, there is any statement, word, or act on his part, which tends affirmatively to the suppression of the truth, or to a covering up or disguising of the truth, or to a withdrawal or distraction of a party's

attention from the real facts"); *Colton, supra,* 231 F.3d at 898–99 (fraudulent concealment may be common-law fraud when the concealment consists of "deceptive acts or contrivances intended to hide information, mislead, avoid suspicion, or prevent further inquiry into a material matter"); RESTATEMENT (SECOND) OF TORTS § 550 (1977) ("One party to a transaction who by concealment or other action intentionally prevents the other from acquiring material information is subject to the same liability to the other, for pecuniary loss as though he had stated the nonexistence of the matter that the other was thus prevented from discovering."); W. Page Keeton et al., *Prosser and Keeton on Torts* § 106 (5th ed. 1984) ("Any words or acts which create a false impression covering up the truth, or which remove an opportunity that might otherwise have led to the discovery of a material fact ... are classed as misrepresentation, no less than a verbal assurance that the fact is not true."). *Cf. Sass v. Andrew,* 152 Md.App. 406, 430, 832 A.2d 247 (2003) stating in *dicta* that, even in the absence of a duty to disclose, the suppression of facts "which materially qualify representations made to another" may support a claim for fraud (quoting *Finch v. Hughes Aircraft Co.,* 57 Md.App. 190, 239, 469 A.2d 867 (1984)).

■ Thus, in Maryland, a cause of action for fraudulent concealment will lie in favor of a purchaser of real property against the seller when, in the absence of any independent duty to disclose, the seller actively and with the intent to deceive conceals a material fact about the property; the purchaser justifiably relies upon the concealment in buying the property; and, as a proximate result, the purchaser suffers damages. Here, apart from the disputed issues of extension of duty, materiality of defect, and damages, the factual allegations in the first amended complaint—that the appellees desecrated the cemetery and then affirmatively acted to hide its presence on Lot 20, intending to conceal, and in fact concealing, its presence—sufficiently state a cause of action for fraudulent concealment. *See Elsey v. Lamkin,* 156 Ky. 836, 838, 162 S.W. 106 (1914) (affirming judgment in favor of purchaser of real property against seller for fraud based upon

the seller's concealing the existence of a cemetery on the property by disclosing the presence of one cemetery on the property and not the other, thereby "creating upon the mind of the vendee a false impression that *full* disclosure has been made and the *whole* truth told").

### 1. *Scope of Duty not to Conceal*

The primary issue in this appeal is whether a real property developer/seller's duty to refrain from actively, intentionally concealing a material defect in the property can extend beyond his immediate purchaser, to a subsequent purchaser. That question is one of law. *Gourdine v. Crews*, 405 Md. 722, 955 A.2d 469, 2008 WL 4068177, No. 134, September Term, 2007, slip op. at 7 (filed September 4, 2008); *Doe v. Pharmacia & Upjohn Co.*, 388 Md. 407, 414, 879 A.2d 1088 (2005).

As noted, the Rhees rely upon *Diamond Plaza Ltd. Partnership v. Wells Fargo Bank, N.A., supra*, 400 Md. 718, 929 A.2d 932, to argue that the duty *does* so extend, *i.e.*, that a developer/seller of real property may be liable for fraudulent concealment not only to the initial purchaser, with whom he transacted the sale, but also to "the persons or class of persons" he either intended to influence or had "reason to expect" would act based upon the concealment. They maintain that, as subsequent purchasers of the Property, they are members of a class of people the appellees had reason to expect would purchase the Property in ignorance of the desecrated cemetery, and therefore to whom the appellees owed a duty to refrain from fraudulently concealing the presence of the cemetery on the Property.

In *Diamond Point*, a partnership that owned a shopping center was seeking to refinance a loan when it learned that one of its anchor tenants was planning to move out. As part of its loan application, it submitted a "Certificate of Borrower," falsely asserting that, among other things, it had no knowledge that any current tenant intended to vacate the premises. On the basis of the information submitted in the loan application, the lender extended a non-recourse loan to the partnership. After the loan closed, the lender assigned it

to Paine Webber Real Estate Securities, Inc., which, in turn, bundled it with similar loans and sold the package to Wells Fargo Bank, N.A. ("Wells Fargo"). Ultimately, the partnership defaulted on the non-recourse loan.

Wells Fargo sued the partnership alleging breach of contract and several tort claims, including fraudulent misrepresentation. It claimed that the partnership had intentionally omitted the negative information about the anchor tenant from its "Certificate of Borrower." The partnership defended on the ground that it had had no communication with Wells Fargo and there was no evidence that Wells Fargo relied on the "Certificate of Borrower." The circuit court rejected that argument and, in a bench trial, rendered a verdict in favor of Wells Fargo on the fraud claim.

The Court of Appeals affirmed the fraudulent misrepresentation judgment. In doing so, it adopted the principles set forth in sections 531 and 533 of the RESTATEMENT (SECOND) OF TORTS. Section 531 states, as a general rule:

> One who makes a fraudulent misrepresentation is subject to liability to the persons *or class of persons* whom he intends or *has reason to expect to act or to refrain from action in reliance upon the misrepresentation,* for pecuniary loss suffered by them through their justifiable reliance in the type of transaction in which he intends or has reason to expect their conduct to be influenced.

(Emphasis added.) Section 533 states with respect to a representation made to a third person:

> The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person *and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transaction involved.*

(Emphasis added.)

The *Diamond Point* Court noted that the partnership was a sophisticated real estate investor and the mortgage documents

it executed expressly stated that the loan *might* be sold on the secondary market. Thus, the Court held, the partnership "had more than good reason to expect" that the misrepresentation (by omission) in its "Certificate of Borrower" would be relayed to and relied upon by future purchasers of the mortgage in that market. For that reason, it could be held liable for pecuniary loss sustained by a future purchaser (Wells Fargo) in justifiable reliance upon the misrepresentation. *Diamond Point, supra,* 400 Md. at 741, 929 A.2d 932. *See also Hoffman, supra,* 385 Md. at 29–30, 867 A.2d 276 (appraiser who knowingly prepared inflated appraisals as part of a property "flipping" scheme could be held liable for fraudulent misrepresentation to the purchasers of the properties; even though the purchasers were not given the appraisals, they relied upon contract documents assuring them that the values of the homes being bought were at least equal to their respective appraisals); *Sempione v. Provident Bank of Md.,* 75 F.3d 951, 962–63 (4th Cir.1996) (holding that the Court of Appeals of Maryland would adopt the principles stated in sections 531, 532, and 533 of the RESTATEMENT (SECOND) OF TORTS and allow a secondary beneficiary of a letter of credit to recover for fraudulent misrepresentation against the issuer of the letter of credit [7]).

The appellees are quick to emphasize that *Diamond Point* involved an affirmative misrepresentation of material fact (albeit by omission), not a concealment of material fact. In the case at bar, by contrast, there was no affirmative misrepresentation by the appellees to the Rhees and indeed no communication between them at all, only (allegedly) the intentional concealment of information about the Property. More-

---

**7.** Section 532 provides:

One who embodies a fraudulent misrepresentation in an article of commerce, a muniment of title, a negotiable instrument or a similar commercial document, is subject to liability for pecuniary loss caused to another who deals with him or with a third person regarding the article or document in justifiable reliance upon the truth of the representation.

over, to the extent information was concealed, it was concealed from the initial purchasers, not from the Rhees.

In response, the Rhees point to the following out-of-state cases in which courts have held developers or contractors liable for pecuniary loss to subsequent purchasers of real property for the tort of fraudulent concealment.

In *Barnhouse v. City of Pinole*, 133 Cal.App.3d 171, 183 Cal.Rptr. 881 (1982), the California Court of Appeal, First District, relying upon section 533 of the RESTATEMENT (SECOND) OF TORTS, held that a property developer could be held liable to a subsequent (*i.e.*, not the initial) purchaser of residential property for fraudulently concealing the existence of defective subsurface soil conditions, including seeps, springs, and slides. The court explained:

Here, the jury could have inferred that [the developer] failed to make the initial disclosures [*i.e.*, to the initial purchasers] with the intention that subsequent purchasers would also act in ignorance. It was foreseeable that in a development of relatively inexpensive suburban tract homes, some would change hands. *While an affirmative misrepresentation might not be repeated, a nondisclosure must necessarily be passed on.* Only [the developer] knew what his soils engineers had found and it was unlikely that others would find out on their own. It was also possible that resulting damage would be delayed depending on the extent of rainfall. Under these circumstances it would be anomalous if liability for damages resulting from fraudulent concealment were to vanish simply because of the fortuitous event of an intervening resale. Ultimately in such a case it is the subsequent purchaser who is directly damaged by the initial nondisclosure.

\* \* \* \* \* \*

We find no difficulty in extending the law of deceit to the situation presented here. *Although a developer does not know that there will be subpurchasers, it is foreseeable that there will be and that they will be the ones to suffer damage. The developer has every reason to expect that if there are*

*subpurchasers, a nondisclosure about subsurface soil conditions will be passed on to them.* Perhaps most important, the rule we announce does not extend the vendor's liability at all—it merely fails to reduce it. At the same time, without such a rule, the subpurchaser has no remedy because he or she can only turn to the vendor with knowledge for recovery.

*Id.* at 192–93, 183 Cal.Rptr. 881 (citations omitted) (emphasis added).

The holding in *Barnhouse* was modified somewhat in *Geernaert v. Mitchell*, 31 Cal.App.4th 601, 37 Cal.Rptr.2d 483 (1995). There, the fourth owners of a residential property sued the previous owners for fraudulent misrepresentation and concealment. The plaintiffs alleged that the first two owners (or one of them) had fraudulently concealed, and also made misrepresentations about, the existence of defective subsurface soil conditions on the property. The lower court dismissed the suit against the prior owners on the ground that neither one owed a legal duty to the plaintiffs.

The appellate court reversed. Noting that the standard for imposing liability under section 531 of the RESTATEMENT is more than mere "foreseeability," the court quoted comment d, as follows:

"Virtually any misrepresentation is capable of being transmitted or repeated to third persons, and if sufficiently convincing may create an obvious risk that they may act in reliance upon it. . . . *This risk is not enough for the liability covered in this Section. The maker of the misrepresentation must have information that would lead a reasonable man to conclude that there is an especial likelihood that it will reach those persons and will influence their conduct.*"

*Id.* at 607, 37 Cal.Rptr.2d 483 (quoting RESTATEMENT (SECOND) OF TORTS, section 531 comment d) (emphasis by court in *Geernaert* ).

The *Geernaert* court held that, for a seller of real property to be liable for pecuniary loss caused by fraudulent concealment or misrepresentation, it is not sufficient that it merely is foreseeable that his concealment or misrepresentation will be

passed on to subsequent purchasers. The seller must have special reason to expect that the concealment or misrepresentation will be passed on to, and relied upon by, the subsequent purchaser. "[W]ith each intervening resale and with each passing year between the occurrence of the original fraud and the lawsuit," that will be more difficult to prove. *Id.* at 608, 37 Cal.Rptr.2d 483. For that reason, the plaintiff must allege "ultimate facts showing that the defendant intended or had reason to expect reliance by the plaintiff or the class of persons of which he is a member." Id. The court concluded that the subsequent purchaser's allegations were legally sufficient and therefore the question whether the owner had special reason to expect that his fraudulent misrepresentation or concealment would be passed on to and relied upon by a subsequent purchaser was one of fact. *Id.* at 608–09, 37 Cal.Rptr.2d 483.

In an analogous situation, in *Woodward v. Dietrich*, 378 Pa.Super. 111, 548 A.2d 301 (1988), property owners hired a plumbing contractor to connect sewer lines from their house to a municipal authority's sanitary sewer system, in accordance with particular specifications and regulations. For one of the lines, the plumber intentionally made no connection but doctored his work so it looked like he had. Two years later, the owners sold the house. The new owners discovered the deceit when a clogged drain flooded the basement, thereby revealing the absence of the line connection. They sued the plumbing contractor for fraudulent concealment. The lower court dismissed the action on the ground that the contractor had not dealt directly with the new owners and therefore did not owe them a legal duty.

The Superior Court of Pennsylvania reversed. It cited sections 531 and 533 of the RESTATEMENT (SECOND) OF TORTS and traced the erosion of the early common law requirement that tort liability for fraud depend upon privity of contract. The court observed that,

> [i]n our present mobile society, estates in land are transferred freely and regularly. Thus, while [the contractor] may not have known that the [owners with whom he dealt]

would sell their home, the possibility of such a sale during the useful lifetime of a sewer connection was certainly quite foreseeable.

*Woodward, supra,* 378 Pa.Super. at 131, 548 A.2d 301. Accordingly, the court explained, the contractor "would have had special reason to foresee that any subsequent purchaser would be unaware of the material latent defect [he] allegedly concealed." *Id.* at 131–32, 548 A.2d 301. Because the reliance of the new owners upon the fraudulent concealment was specially foreseeable and the legal requirement of privity of contract no longer applied, the court could see

> no reason why the ... sale of the home to the [new owners] should absolve [the contractor] from liability.... *When fraud creates or conceals a latent defect, transfer of the defective chattel or realty to an innocent third party should not absolve the wrongdoer from liability for damages caused by that undiscovered fraud.*

*Id.* at 141, 548 A.2d 301 (emphasis added).

The appellees argue that *Barnhouse* and *Geernaert* are not persuasive because in California, unlike in Maryland, the seller of real property has a duty to disclose all material facts to his immediate purchaser, and therefore may be held liable to that purchaser for damages caused by a mere non-disclosure. *Compare Fegeas, supra,* 218 Md. at 477, 147 A.2d 223 ("Unless the seller of real estate, because of fiduciary or other similar relations of trust, is under a duty to disclose facts as to the property known to him but not to the buyer, generally he need not do so....").[8]

Assuming this distinction in the laws of the two states exists, it is not dispositive. The factual allegations here are not of a mere non-disclosure, so that, in the absence of a legal duty to the initial purchaser to disclose a material defect, there would be no foundation to extend such a legal duty to a subsequent purchaser. The allegations are of intentional (and as we shall discuss, illegal) conduct actively undertaken to conceal the existence of the cemetery on Lot 20: Removing

---

8. The appellees do not discuss the *Woodward* case in their brief.

the headstones, redrawing the building envelope so as to avoid construction in the area of the desecrated cemetery, thereby hiding it further, and removing all reference to the cemetery from the worksheets necessary for subdivision approval, so that its existence would not become known to any State or County agencies involved in approving construction in Brighton Pines. These are not alleged acts of non-disclosure but of active suppression.

To be sure, in a state that has abolished the doctrine of *caveat emptor* and will impose liability against a seller of real property for mere non-disclosure of a material defect in real property, then when a plaintiff/purchaser later learns of the defect in the property, he likewise has a duty to disclose it upon re-sale to a subsequent purchaser (assuming it has not been corrected). For that reason, as long as the defect continues to exist, all future purchasers will be entitled to recover for non-disclosure if disclosure is not made. But in Maryland, as we have explained, ordinarily there is no duty to disclose and mere non-disclosure is not actionable. In this case, this distinction only will matter in the event that the Rhees prevail in the case and recover damages for fraudulent concealment, leave the desecrated cemetery in place (*i.e.,* concealed), and then re-sell the Property without disclosing the cemetery's existence or discounting the sales price to account for the cemetery's presence. In that circumstance, the Rhees possibly could expose themselves to liability, however, for constructive fraud, based on passive concealment.[9]

■ The pertinent question with regard to the scope of the legal duty not to fraudulently conceal is whether the principles

---

**9.** Some states, most notably Georgia, have recognized the passive concealment theory of fraud as an exception to the *caveat emptor* doctrine, in the sale of real estate. The passive concealment fraud theory "places upon the seller a duty to disclose in situations where he or she has special knowledge not apparent to the buyer and is aware that the buyer is acting under a misapprehension as to facts which would be important to the buyer and would probably affect its decision." *Wilhite v. Mays,* 140 Ga.App. 816, 818, 232 S.E.2d 141 (1976). The seller's special knowledge gives rise to an independent duty to disclose but only if the defects are of such a nature "that the buyer

in sections 531 and 533 of the RESTATEMENT (SECOND) OF TORTS, already having been applied by the Court of Appeals to extend liability for fraudulent misrepresentation of a borrower to a secondary purchaser of his loan, and already having been applied by the federal district court in Maryland to extend liability for fraudulent misrepresentation of the issuer of a financial instrument to a subsequent purchaser of the instrument, should apply to extend liability of a developer/seller of real property to a subsequent purchaser for fraudulent concealment of an adverse material fact about the property. We think the principles should apply to this situation as well for two reasons.

■ First, as we have discussed, the common law causes of action for fraudulent misrepresentation and fraudulent concealment are substantively indistinct.

---

could not discover them through the exercise of due diligence." *Smalls v. Blueprint Dev., Inc.*, 230 Ga.App. 556, 557–58, 497 S.E.2d 54 (1998).

> Where a buyer seeks to recover from a seller who has passively concealed a defect, "the buyer must prove that the vendor's concealment ... was an act of fraud and deceit, including evidence that the defect could not have been discovered by the buyer by the exercise of due diligence and that the seller ... was aware of the problems and did not disclose them."

*Salinas v. Skelton*, 249 Ga.App. 217, 221–22, 547 S.E.2d 289 (2001) (quoting *Ben Farmer Realty Co. v. Woodard*, 212 Ga.App. 74, 76, 441 S.E.2d 421 (1994)). WILLISTON ON CONTRACTS, § 69:19 (4th ed.2003) (explaining that possession by one party of special knowledge about a latent defect in the subject of the parties' agreement imposes a duty on the seller to reveal the defect). *See also Stebbins v. Wells*, 766 A.2d 369, 373 (R.I.2001) (per curiam) (recognizing the passive concealment exception to the *caveat emptor* doctrine when vendor of real property has special knowledge, not apparent to the purchaser, and knows that the purchaser is operating under a material misapprehension as to facts that would be important to his decision); *Lynn v. Taylor*, 7 Kan.App.2d 369, 371, 642 P.2d 131 (1982) (recognizing that a party to a contract for sale of real estate who has special knowledge of a defect that cannot be found by reasonable diligence must speak, and his silence constitutes fraud); *Ryan v. State*, 77 N.Y.S.2d 764, 192 Misc. 408, 414 (N.Y.Ct.Cl. 1948) (recognizing "passive concealment with the legal effect of fraud," creating an exception to the traditional common law rule that a landlord was not liable in negligence for dangerous condition in demised premises).

> [T]he concealment or suppression [of a material fact] is in effect a representation that what is disclosed is the whole truth. The gist of the action [for fraud] is fraudulently producing a false impression upon the mind of the other party; and if this result is accomplished, it is unimportant whether the means of accomplishing it are words or acts of the defendant. . . .

*Stewart,* supra, 128 U.S. at 388, 9 S.Ct. 101. Whether negative information about property that is the subject of a transaction is overtly lied about or is actively but covertly covered up, the other party to the transaction is intentionally misled to his detriment. There is no principled reason, therefore, to apply sections 531 and 533 of the RESTATEMENT (SECOND) OF TORTS to causes of action for fraudulent misrepresentation but not to causes of action for fraudulent concealment.

 Second, in both contexts, parties to subsequent transactions involving the same subject matter who rely upon the same misrepresented or concealed facts likewise will be misled, and the fraud tortfeasor has reason to expect, beyond a general notion of foreseeability, that such secondary misrepresentations will occur. Comment e to section 531 provides in part:

> The maker [of the misrepresentation] may have reason to expect that his misrepresentation will reach any of a class of persons, although he does not know the identity of the person whom it will reach or indeed of any individual in the class. . . . The class may include a rather large group, such as potential sellers, buyers, creditors, lenders or investors, or others who may be expected to enter into dealings in reliance upon the misrepresentation.

We agree with the observation of the court in *Barnhouse v. City of Pinole, supra,* that when concealment of a defect in real property is the seller's (or seller/developer's) intended objective, and he takes active measures to hide the defect, he is expecting that in the ordinary course of events the defect will remain concealed, not only from the initial purchasers but also from future purchasers, *i.e.,* that, absent an intervening

event, the concealment will be passed on. *Barnhouse, supra,* 133 Cal.App.3d at 192, 183 Cal.Rptr. 881. The more ingenious the deception by concealment, the more likely it is that the defect will be passed unknowingly from one property purchaser to the next. If the concealment keeps the seller/developer's immediate purchasers in the dark about the existence of the defect, that is due to his proficiency in perpetrating the fraud. He should not be protected from liability for fraud because the defect he has concealed does not become manifest until after the property has transferred hands. *Id.* ("[I]t would be anomalous if liability for damages resulting from fraudulent concealment were to vanish simply because of the fortuitous event of an intervening resale.").

That equitable concept is no different than the one underlying limitations statutes that toll causes of action concealed by fraud. *See* Md.Code (1974, 2006 Repl.Vol.), section 5–203 of the Courts and Judicial Proceeding Article. When a fraud tortfeasor has so successfully carried out his plan that his victim does not even know he has been victimized, and therefore cannot know to pursue him in court, it would be unjust to bar the victim from suing because of the passage of time. Likewise, when a seller/developer of real property successfully conceals a defect from his initial purchaser, so that the defect is reconveyed with the property to a new purchaser, it would be unjust to bar that subsequent purchaser, who unknowingly purchased the defective property, from suing because the original victim did not know he had been defrauded.

Of course, as the admonition in comment d to section 531 directs, to owe a legal duty to a subsequent purchaser to refrain from fraudulently concealing a material defect in real property, the seller (or developer/seller)

> must have information that would lead a reasonable man to conclude that there is an especial likelihood that it will reach those persons and will influence their conduct. There must be something in the situation known to the maker that

would lead a reasonable man to govern his conduct on the assumption that this will occur.

RESTATEMENT (SECOND) OF TORTS, § 531 cmt. d.

Finally, we note that this case is distinguishable from the recent decision in *Gourdine v. Crews, supra,* in which the Court of Appeals held that a manufacturer of insulin medications did not owe a legal duty to warn of the dangers of the medications to non-users. There, a non-user driver was killed in an automobile accident when his car was struck by a user driver who, reacting to the medications, "blacked out" and lost control of her vehicle. The decedent's wife sued the drug manufacturer for negligence, strict liability, and fraud. In her fraud claim, the plaintiff alleged that the drug manufacturer had knowingly published false statements about the dangers associated with the medications, that the user had taken the medications in reliance upon the misrepresentations, and that liability for the misrepresentations extended to the decedent because it was foreseeable that someone in his position— traveling on the same highway as the user—would die if the user suffered an adverse reaction while driving.

The Court determined that the drug manufacturer did not owe a legal duty to the decedent non-user of the medications under any of the theories alleged. Observing that "[d]uty requires a close or direct effect of the tortfeasor's conduct on the injured party," *Gourdine, supra,* 746, 955 A.2d at 784, the Court reasoned:

> [T]here was no direct connection between [the manufacturer's] warnings, or the alleged lack thereof, and [the decedent's] injury. In fact, there was no contact between [the manufacturer] and [the decedent] whatsoever. To impose the requested duty ... would expand traditional tort concepts beyond manageable bounds, because such duty could apply to all individuals who could have been affected by [the user driver] after her ingestion of the drugs. Essentially, [the manufacturer] would owe a duty to the world, an indeterminate class of people, for which we have "resisted the establishment of duties of care."

*Id.* at 750, 955 A.2d at 766 (quoting *Doe,* supra, 388 Md. at 407, 879 A.2d 1088). With respect to the fraud claim in particular, the Court stated, "[c]learly, in order to sustain a cause of action based on fraud or deceit, the defendant must have made a false representation **to the person defrauded.**" *Id.* at 759, 955 A.2d at 791 (emphasis in original).

In the case at bar, as in *Diamond Point,* the class of people to whom the duty not to defraud was owed was not indeterminate; rather, it was especially foreseeable to the tortfeasor that the representation or concealment would be received by the person defrauded, as a member of a limited and defined class of people. The facts alleged in *Diamond Point* permitted a reasonable inference that the defrauding party knew that its written omission of fact would be transmitted to, and relied upon, by purchasers in the secondary market, such as Wells Fargo. Likewise, the facts alleged in the case at bar permit a reasonable inference that the appellees knew that the concealed defect in the Property would remain concealed, as the Property changed hands as it would be expected to do. Indeed, the class of people—future purchasers of the Property—the appellees would have reason to expect would be defrauded by the concealment is small in comparison to the secondary mortgage market class the Court of Appeals held was owed a fraud duty in *Diamond Point.*

The factual allegations in the first amended complaint were sufficient, if proven, to allow a trier-of-fact to find that the appellees concealed the presence of the cemetery on the Property, intentionally and with the purpose to deceive, by desecrating it and then taking steps through the construction and platting process to further conceal its (now hidden) presence on the Property; and that they did so in circumstances in which there was reason to expect that the condition would remain concealed on the Property, the Property would change hands, and the subsequent purchaser would take ownership without knowing about the condition. These facts, if proven, would implicate the principles of sections 531 and 533 of the RESTATEMENT (SECOND) OF TORTS, so that the appellees, as the seller/developers of the Property, owed a legal duty, to the

Rhees, to refrain from fraudulently concealing a material defect in the Property.

## 2. *Materiality of Presence of Hidden Desecrated Cemetery on Property*

Because we have held that the appellees owed a legal duty to the Rhees, we turn to alternative arguments the appellees advance in their quest for an affirmance of the circuit court's dismissal order. One such argument is that the allegations in the first amended complaint are legally insufficient to establish the materiality element of fraudulent concealment. The appellees maintain that the presence of long-ago buried human remains on real property simply is not a material fact about the property, *i.e.*, one that would influence a reasonable prospective purchaser's buying decision. Because human beings have been burying their dead forever, it is the expected state of affairs, for most property, that some human remains will be underground, and that state of affairs will not influence a reasonable person's decision whether to purchase. Therefore, they did not owe anyone (the initial purchasers or any subsequent purchasers) a duty to refrain from concealing the desecrated cemetery's existence on the property. In other words, a seller of property would not have reason to expect that the presence of a desecrated, not visible cemetery on real property would influence the purchasing decisions of an immediate, or a subsequent potential, buyer. If it is a defect in the Property at all, it is not material.

As the Court of Appeals has recognized, cemeteries carry a cultural significance that argues traditionally for non-disturbance: " 'A place for the burial of the dead ... has characteristics differing from those of an ordinary tract of land. To many it is sacred ground which should not suffer intrusion from mundane objects.' " *Hickman v. Carven, supra,* 366 Md. at 371, 784 A.2d 31 (quoting *Abell v. Green Mount Cemetery,* 189 Md. 363, 366, 56 A.2d 24 (1947)). The General Assembly has enacted laws, both criminal and regulatory, that limit, control, and punish conduct relating to burial places. These statutory restrictions, which we discuss below, can

detract significantly from the value of a given tract of land for residential use: "[A]part from any personal reluctance to live on top of burial sites with human remains resting barely two feet below ground, [the desecration and concealment of a graveyard] places limitations and potential obligations on the buyers that they would not expect, or desire, for residential property." *Id.* at 373, 784 A.2d 31.

Certain conduct relating to human remains has been criminalized, in statutes presently codified in Md.Code (2001, 2007 Supp.), sections 10–401 *et seq.* of the Criminal Law Article ("CL"). CL section 10–404(a)(1) prohibits the destruction, damaging, defacement, or removal of an "associated funerary object ... placed in a cemetery," which includes a gravestone. *See* CL § 10–401(c)(2) (defining "associated funerary object" to include "a gravestone"). Doing so is a misdemeanor that subjects the violator to a prison term not exceeding 5 years or a fine not exceeding $10,000 or both. CL § 10–404(d)(1).

Significantly, subsection (e) of CL section 10–404, entitled, "Construction of section," states, in relevant part:

This section does not prohibit the removal of human remains or a funerary object from an abandoned cemetery if:

(1) the removal is authorized in writing by the State's Attorney of the county in which the cemetery ... is located; and

(2) the human remains or funerary object are placed in an accessible place in a permanent cemetery.

CL section 10–402(a) prohibits removing human remains without authority, except as provided in subsection (b), which establishes a procedure for obtaining written permission from the State's Attorney for the county in which the remains are located. CL section 10–402(d) directs that any human remains so removed shall be reinterred, with one exception, in "a permanent cemetery that provides perpetual care."

When Brighton Pines was under construction, the criminal statutes governing the destruction of funerary objects and the removal of human remains without authority were codified in Md.Code (1957, 1982 Repl.Vol.), article 27, sections 265 and

267. They were substantively the same as the statutes mentioned above. Thus, when the appellees discovered the abandoned cemetery on Lot 20, as alleged, they were prohibited by law from removing the gravestones and could have faced misdemeanor charges and, upon conviction, prison time and/or a fine for doing so.[10] They could have accomplished their goal of developing Lot 20 but only with the authorization of the State's Attorney for Howard County and by taking the measures required by statute to remove and rebury any human remains. It is implicit in the allegations in the first amended complaint that the appellees sought to circumvent that process, and the expenses they would incur, by engaging in criminal acts to cover up the cemetery's existence.

 If the appellees had abided by the statutes controlling the removal of funerary objects and reburial of human remains, the cemetery, including the remains, would not have been present on Lot 20 when it was developed and sold as the Property. In oral argument before this Court (although not

---

10. The "Maryland Cemetery Act" regulating the operations of cemeteries and cemetery companies presently is codified in Md.Code (1992, 2004 Repl.Vol., 2008 Supp.), sections 5–101 *et seq.* of the Business Regulations Article. When Brighton Pines was being developed, that act was codified in Md.Code (1957, 1981 Repl.Vol., 1986 Supp.), Art. 23, sections 162–165B. Section 165A, entitled "Perpetual care," subjects owners and developers of cemeteries to a state regulatory scheme. Subsection (j), entitled "Exempt cemeteries," stated:

 The provisions of this section shall not apply to cemeteries containing less than one acre of land available for interment or owned and operated by any county, city, or town; by a church, synagogue or other religious or church organization; or by any nonprofit organization, which was created by an act of the General Assembly ... prior to 1900.

 The appellees argue that, in the 1980's, Article 23, section 165A(j) would have exempted the cemetery on the Property from regulatory control because it had less than one acre of land available for interment. However, this exemption only was from other regulations in sections 165A and 165B relating to the regulation of cemetery owners and funeral businesses. Section 165A(j) did not exempt the cemetery in this case from the criminal laws described above, nor did section 165A(j) exempt the cemetery owner from Article 16, section 119, which comprehensively regulated any sale of a cemetery and provide, *inter alia,* that the seller pay for the disinterment and reburial of the dead.

in the first amended complaint), counsel for the Rhees alleged that their religious beliefs prohibit living on land where a cemetery ever has existed. On this point, we observe that, had the laws been followed and had the cemetery, including the human remains, been removed, legally, from Lot 20, the fact that a cemetery once had been located there would not be a material defect in the Property.

■ That is not what is alleged, however. On the facts alleged, a cemetery, including human remains, still exists on the Property, in a desecrated state. The appellees point out that (assuming the truth of the allegations, which as stated above they vigorously contest), the Rhees' house does not sit atop any buried remains, as the building envelope intentionally was redrawn so that the area of the cemetery would not be moved during construction. That assumes that the Property only would be materially defective if the house were situated over the human remains. The Property consists of the improvements *and* the land, however, and, with proof, it could be established that the Rhees' land in its present state, with buried human remains, is not as valuable as it would be if there were no remains there, either because the use of the land (for example, to build a swimming pool) is limited or the knowledge of the presence of the human remains underground carries a stigma that reduces the occupants' enjoyment of the land.

The facts asserted in the first amended complaint, that as a consequence of the appellees' fraudulent concealment, the Rhees own land in which human remains are buried, are sufficient to allege a material defect in the Property and therefore to state a cause of action for fraudulent concealment.

### 3. *Damages*

As their second and last alternative argument for affirmance, the appellees maintain that the first amended complaint failed to state a claim for which relief could be granted because it did not adequately allege that the Rhees suffered any damages.

Analogizing this case to *Rossaki v. NUS Corp.*, 116 Md.App. 11, 695 A.2d 203 (1997), the appellees argue that any diminution in value of the Property occurred when the initial purchasers owned it, not when the Rhees owned it, and therefore the Rhees did not sustain a compensable injury. This analogy does not hold up under analysis, however.

In *Rossaki*, the plaintiffs purchased property from the owner, which had been leasing it for use as a gas station. Before closing, the plaintiffs had had the property inspected for contamination. There were numerous disputes over whether the plaintiffs or the owner and lessor were responsible for the inspections and over whether the inspections properly were carried out. In any event, after closing, another inspection, conducted by a potential new lessee, revealed extensive contamination that the earlier inspection had not. The plaintiffs sued the owner and lessee, among others, asserting various causes of action based on nuisance, negligence, and strict liability, and seeking compensation for the property damage by way of a private cause of action under section 4–409(a) of the Environment Article ("EA"), which states:

> *Liability generally.*—The person responsible for the oil spillage shall be liable to any other person for any damage to his real or personal property directly caused by the spillage.

EA § 4–409(a). As to the owner and lessee, the court granted motions to dismiss the common law actions and the statutory cause of action.

On appeal, the plaintiffs did not contest the rulings below on the common law claims. The circuit court had dismissed those claims because, on the facts alleged, the plaintiffs had known, before the purchase, that the property had been operated as a gas station and therefore may have been contaminated and, with that knowledge, could have negotiated terms to the sales contract, such as express warranties, to protect them.

This Court did not address the global question presented, which was whether EA section 4–409(a) creates any private

right of action for property damage, *i.e.*, a cause of action in favor of the owners or neighboring properties whose land has been contaminated by a spillage. Instead, we addressed the limited question whether the plaintiffs were beneficiaries of any private right of action that EA section 4–409 might create. Observing that "the concept of property damage contemplates that the damage occur while the claimant owns or occupies the property, and that the damage affect the value or use of the property," we interpreted the operative statutory language as not creating a private right of action in favor of a subsequent purchaser of already-contaminated real property against the prior owner or occupier responsible for the contamination. *Id.* at 22–23, 695 A.2d 203. We interpreted the statutory language narrowly, because it is in derogation of the common law.

██ The case at bar does not concern damage to property of the sort involved in *Rossaki.* Here, accepting the well-pleaded facts as true, the Property started off with a cemetery on it. The presence of the cemetery on the Property did not damage it; rather, it was a feature on the Property that could be observed by the naked eye, and likely would make the Property less desirable, because of the added expense required to move it, than the Property would be if the cemetery were not there. The appellees are accused of acting fraudulently to conceal that already-existing negative feature of the Property. That is not the same as being accused of causing property damage.

The appellees also argue that the Rhees could not have suffered a compensable injury because "[n]o living person could now have any possible property interest in this abandoned burial site, other than the Rhees themselves." The injury the Rhees are claiming is not that other people may have rights, such as easements, that would allow them to come upon the Property. It is that they purchased the Property at an inflated price because a significant defect in it had been concealed, by fraud. The injury they claim to have suffered has nothing to do with whether any other person would ever

claim a right to come upon the Property because of the presence of the (now desecrated) cemetery.

**JUDGMENT REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR HOWARD COUNTY FOR FURTHER PROCEEDINGS. COSTS TO BE PAID BY THE APPELLEES.**